Erwin J. Shustak (SBN 119152)
Mahdi M. Ibrahim (SBN 276742)
SHUSTAK REYNOLDS & PARTNERS, P.C.
401 West "A" Street, Suite 2200
San Diego, CA 92101
t: (619) 696-9500
f: (800) 868-9350
e: *eshustak@shufirm.com*
e: *mibrahim@shufirm.com*

*Attorneys for Plaintiffs John Dunphy and KiHo Choi*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DUNPHY, an individual, and KIHO CHOI, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>HAUSSMANN FINANCIAL, INC., a California corporation,<br><br>Defendant. | Case No. 8:25-cv-19<br><br>**COMPLAINT FOR:**<br><br>1. **DECLARATORY JUDGMENT AS TO 18 U.S.C. § 1836**<br>2. **DECLARATORY JUDGMENT AS TO EMPLOYMENT AGREEMENT**<br>3. **VIOLATION OF CAL. BUS. & PROF. CODE, §17200** |

1.   Plaintiffs John Dunphy and KiHo Choi (collectively, "Plaintiffs") complain and allege, upon information and belief except as otherwise specifically stated, against Defendant Haussmann Financial, Inc. ("Defendant" or "Haussmann Financial") as follows:

**THE PARTIES**

2. Plaintiff Dunphy was employed by Haussmann Financial as a FINRA registered financial adviser from the mid-1990s until his voluntary resignation on January 6, 2025. Dunphy is a California resident residing in Orange County and is transitioning his FINRA license and registration to Cetera Advisor Networks LLC ("Cetera").

3. Plaintiff Choi also was employed by Haussmann Financial as a FINRA registered financial adviser from the mid-1990s until his voluntary resignation on January 6, 2025. Choi also is a California resident residing in Orange County and is transitioning his FINRA license and registration to Cetera.

4. Defendant Haussmann Financial, owned and operated by Trudy Haussmann, is a California financial planning corporation with its principal place of business in Lake Forest, California. Haussmann Financial has been in business since 1990 and employs about 14 financial advisers and staff, including Plaintiffs before they resigned. Haussmann Financial manages approximately $950 million in client assets and is currently affiliated with Osaic Wealth, Inc. ("Osaic"), an independent broker/dealer with over 1,800 registered representatives nationwide.

**JURISDICTION AND VENUE**

5. The Court has jurisdiction over this matter under 28 U.S.C. § 1331. Plaintiffs' claims for declaratory relief arise, in part, under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., as Plaintiffs seek a declaration they did not violate the DTSA; Defendant otherwise has no valid claims against Plaintiffs under that statute; and Defendant has no basis to obtain temporary injunctive relief, permanent injunctive relief, or other relief against them.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because Defendant actively and regularly conducts business in this district and a substantial portion of the events and/or omissions giving rise to Plaintiffs' claims

occurred in this district. Among other things, Defendant employed Plaintiffs and entered into employment agreements with them in this judicial district.

## FACTUAL BACKGROUND

7. Dunphy and Choi are experienced financial advisers with nearly sixty combined years of experience in the financial services industry. Both Plaintiffs have worked at Haussmann Financial for nearly their entire careers. In the mid-1990s, Dunphy began working in the financial planning field for Haussmann Financial in Newport Beach. A year later, he was promoted to Senior Adviser and expanded into full financial planning, including asset allocation analysis.

8. Choi also joined Haussmann Financial in the mid-1990s and worked there until his recent resignation. Before joining Haussmann Financial, Choi underwent an extensive two-year financial adviser training program at Merrill Lynch in Santa Monica, California. He completed the program at the top of his class and was voted by his peers as "Most Likely to Succeed as a Financial Planner." Over the past three decades, Plaintiffs have worked tirelessly to serve their existing clients and grow their client base.

9. Each Plaintiff signed an individual employment agreement with Haussmann Financial as part of their employment. True and correct copies of the agreements are attached and incorporated by reference: the Dunphy Agreement as Exhibit 1 and the Choi Agreement as Exhibit 2 (collectively, the "Agreements").

***The Agreements allow for immediate termination.***

10. The Dunphy Agreement permits the agreement's termination under three specific conditions (*see* Ex. 1, Sec. VI(B)):

    a. By either party, without cause, upon 90 days advance written notice to the other party; or

    b. By either party in the event such party or the other party ceases to be a member of or otherwise affiliated with Securities America, Inc.; or

    c. Upon mutual written agreement of the parties.

11. Haussmann Financial's principal and owner, Trudy Haussmann, recently announced to Plaintiffs her intent to end Haussmann Financial's affiliation with Osaic (f/k/a Securities America, Inc.) and join a new broker-dealer, triggering Dunphy's immediate termination rights under Section VI(B)(2) of the Dunphy Agreement.

12. The Choi Agreement also permits the agreement's termination under three specific conditions (*see* Ex. 2, Sec. IV(B)):

    a. By either party, without cause, upon 90 days' advance written notice to the other party; or

    b. By either party should one of the parties engage in conduct that adversely affects or could adversely affect the relationship or reputation of Haussmann Financial with its clientele; e.g., the conviction of a crime for financial dishonesty, theft of client monies, and other serious ethical violations; or

    c. Upon mutual written agreement of the parties.

13. Plaintiffs are aware Trudy Haussmann's husband, Robert Haugan, has been involved in the marijuana business for several years. Plaintiffs recently learned, however, FINRA is investigating the relationship between Haussmann Financial and Mr. Haugan's marijuana business and has requested information from the firm regarding his involvement in Haussmann Financial.

14. Due to the negative reputational impact of a marijuana business's association with Haussmann Financial and the related FINRA investigation, Choi's right to immediate termination is triggered under Section IV(B)(2) of the Choi Agreement.

**The Agreements also contain illegal, unenforceable, and void provisions.**

15. The Agreements include unlawful and void provisions seeking to restrict Plaintiffs from lawfully competing with Haussmann Financial.

16. The Dunphy Agreement states, "From and after the termination of this Agreement, DUNPHY shall not, directly or indirectly, solicit for himself or any other

person or entity any of HAUSSMANN's existing clients and HAUSSMANN shall not, directly or indirectly, solicit for itself, its shareholders, or any other person or entity any of DUNPHY's existing clients." *See* Ex. 1, Section VII(A).

17. The Dunphy Agreement also unlawfully restricts Dunphy from soliciting certain clients after his resignation unless he pays Haussmann Financial a significant commission for each client:

> Notwithstanding anything in Paragraph VII.A., above, to the contrary, DUNPHY shall have the right to solicit PACIFIC BELL PERSONNEL including, without limitation, any persons listed on the PROSPECT LIST, following the termination of this Agreement and any such persons who thereafter become clients of DUNPHY shall be considered SUBSEQUENT CLIENTS with respect to whom **DUNPHY shall be obligated to pay to HAUSSMANN the percentage of commissions applicable to SUBSEQUENT BUSINESS** as set forth in Paragraph VI.C.2. *Id.*, Section VII(B). (Emphasis added).

18. Likewise, the Choi Agreement also restricts Choi from lawfully competing with Haussmann Financial should he voluntarily resign:

> CHOI specifically agrees that he (or any employer, subsidiary, or agent) will not hire, directly or indirectly, for a period of twelve (12) months after the termination of this agreement, any individual previously employed by Haussmann Financial, Inc. in the one year period prior to the termination of the agreement. CHOI agrees not to directly or indirectly solicit these individuals, or encourage them to leave the employment of Haussmann Financial, Inc., and agrees not to use their services in any fashion whatsoever for the time prescribed by this paragraph. Should CHOI violate this paragraph, the parties agree that liquidated damages shall be that CHOI shall pay whatever employer search fee Haussmann Financial, Inc. shall pay to locate a replacement individual, and CHOI shall pay an extra 10% to Haussmann Financial, Inc. on all JOINT BUSINESS and SUBSEQUENT BUSINESS for two (2) years after the employee becomes associated with Choi, his employer, subsidiary, agents, or assigns. *See* Ex. 2, Section IV(D).

19. The Choi Agreement also unlawfully requires Choi to continue paying commissions to Haussmann Financial even after his employment ends:

- For JOINT BUSINESS. CHOI shall pay Haussmann fifty percent (50%) of all COMMISSIONS he earns from that client. Any JOINT BUSINESS that originated outside of the SERVICE AREA shall revert to PERSONAL BUSINESS seven years after the date on which the retirement funds were invested. As set forth earlier, the designation of whether a client is within the SERVICE AREA shall be made at the time the client invests funds under the management of HAUSSMANN and shall be binding on the parties. The obligation to pay HAUSSMANN for JOINT BUSINESS shall terminate 5 years after termination of this AGREEMENT. *See* Ex. 2, Section III(A)(2).

- With respect to SUBSEQUENT BUSINESS, the parties shall print out a list of individuals who are prospective clients in the ACT databases maintained by HAUSSMANN and CHOI. Any contact in those databases that is serviced by CHOI after termination of this Agreement shall be considered SUBSEQUENT BUSINESS, and CHOI shall pay or cause to be paid SUBSEQUENT COMMISSIONS to HAUSSMANN for a period of seven (7) years after that client's account begin to generate commission payments to CHOI. *See* Ex. 2, Section III(C)(2).

***The Agreements' restrictive provisions violate California law.***

20. The above provisions are an illegal attempt to prevent Plaintiffs from soliciting clients or Haussmann Financial employees to leave the company, or otherwise force Plaintiffs to pay a penalty for competing with Haussmann Financial after their resignation. These restrictive provisions are *per se* unlawful under California law and violate California's strong, longstanding, and well-settled policy favoring open competition and worker mobility. California Business and Professions Code § 16600 prohibits contracts restraining anyone from engaging in a lawful profession, trade, or business, and restrictive covenants of this type are unlawful as a matter of law under longstanding California public policy. There are only three limited exceptions: (1) §

16601 (sale of goodwill or business interest); (2) § 16602 (partnership dissolution); or (3) § 16602.5 (LLC dissolution or sale), none of which apply here.

21.     Section 16600 also invalidates provisions prohibiting a worker from competing with a former employer (including non-solicitation provisions) or "imposing a penalty if he does so unless they are necessary to protect the employer's trade secrets." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 945-946 (2008) (quoting *Muggill v. Reuben H. Donnelly Corp.,* 62 Cal. 2d 239, 242 (1965).) Since it is unnecessary to protect trade secrets, the requirements that Plaintiffs pay commissions to Haussmann Financial to solicit clients or employes – which Plaintiffs are already entitled to – is an illegal "penalty" and imposes a void and unenforceable "pay-to-compete" obligation on Plaintiffs.

22.     California's recent amendment to Section 16600, which became effective January 1, 2024, expands the already robust protections against anti-competitive agreements. The expanded statute adds to section 16600: "This section shall be read broadly, in accordance with Edwards v. Arthur Andersen LLP (2008) 44 Cal.4th 937, to void the application of any noncompete agreement in an employment context, or any noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception in this chapter." Cal. Bus. & Prof. Code, § 16600(b)(1).

23.     If Haussmann Financial tries to enforce these illegal provisions against Plaintiffs, it will violate the newly enacted Cal. Bus. & Prof. Code, §§ 16600.1 and 16600.5 and engage in unfair competition. Section 16600.1(a) explicitly states, "It shall be unlawful to include a noncompete clause in an employment contract, or to require an employee to enter a noncompete agreement, that does not satisfy an exception in this chapter." Section (c) adds, "A violation of this section constitutes an act of unfair competition within the meaning of Chapter 5 (commencing with Section 17200)." Cal. Bus. & Prof. Code, § 16600.1(c).

24.     Section 16600.1(b) also required Haussmann Financial and other companies to give notice, on or before February 14, 2024, to any employees or

independent contractors that anti-competitive provisions such as those cited above are unenforceable under California law. Haussmann Financial failed to provide Plaintiffs with this statutory notice.

25. Section 16600.5(c) expands California's strong open competition and worker mobility policy, stating, "An employer shall not enter into a contract with an employee or prospective employee that includes a provision that is void under this chapter." Section 16600.5 also imposes penalties on employers who try to enforce restrictive contracts on employees: "An employer that enters into a contract that is void under this chapter or attempts to enforce a contract that is void under this chapter commits a civil violation." Cal. Bus. & Prof. Code, § 16600.5(d).

**The Protocol for Broker Recruiting's history.**

26. Both Osaic (Plaintiffs' former and Haussmann Financial's current broker-dealer) and Cetera (Plaintiffs' new broker-dealer) are Protocol for Broker Recruiting ("Protocol") signatory members. The Protocol is an agreement among participating firms allowing financial advisers transitioning from one Protocol member firm to another to take certain client information, including client names, addresses, account titles, email addresses, and phone numbers with them without the threat of litigation. The transitioning adviser may then use that information to contact clients if the adviser has met the Protocol terms.

27. The Protocol was born out of an avalanche of "trade secret" litigation between the largest Wall Street firms in the 1990s through the early 2000s. When an adviser would leave one firm to join another, the former firm would routinely seek a temporary restraining order ("TRO") or other emergency injunctive relief, claiming, among other things, the basic client information the adviser had access to during their employment constituted highly confidential, legally protected trade secrets. Firms would argue the client relationship belonged to the firm and client contact information was a legally protected "trade secret." In seeking – and routinely obtaining – emergency injunctive relief, the departed firm's goal was to block the adviser's transition to the

new firm or, at a minimum, buy time to persuade clients not to move. That same firm, of course, would take the opposite position when recruiting new advisers and encourage them to transition their clients and assets into the firm.

28. Recognizing the growing abundance of actions seeking TRO's and Preliminary Injunctions that then abounded throughout the financial services industry, and to rein in ballooning legal costs and escalating client confusion, Wall Street firms formed the Protocol in 2004. Osaic joined the Protocol in 2009, and Cetera joined in 2010. There are now more than 1,700 Protocol members, including FINRA broker-dealers and SEC and state regulated Registered Investment Adviser firms.

29. The purpose of the Protocol was for firms to put clients' needs ahead of their own and allow financial advisers the freedom to move from one firm to another without the former firm interfering with client relationships. According to the Protocol, its "principal goal is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ('RR') between the firms."[1]

30. The Protocol further states: "If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm. . . . The signatories to this protocol agree to implement and adhere to it in good faith."

**Plaintiffs are not using confidential, trade secret information.**

31. Plaintiffs' Agreements define Haussmann Financial "trade secrets" to include "names, addresses, and other confidential information on current HAUSSMANN clients and prospects." The Agreements also prohibit Plaintiffs from

---

[1] https://jsheld-prod.imgix.net/Copy_of_Broker_Protocol.pdf

"disclos[ing] any of the information described above as trade secrets, directly or indirectly, or use them in any way, either during the term of this Agreement or after termination…." *See* Ex. 1, Section V(A).

32. Haussmann Financial's definition of a "trade secret" is excessively broad and encompasses information that does not qualify as a legally protectable trade secret and which the Protocol allows advisers to take.

33. Plaintiffs, through years of servicing their clients, have knowledge of certain basic client contact information, including their clients' names, phone numbers, and email addresses. When they voluntarily resigned from Haussmann Financial, Plaintiffs did not take any protected, trade secret information they were not legally entitled to take.

34. By permitting advisers to take client names, addresses, account titles, email addresses, and phone numbers via the Protocol when they depart the firm, Osaic (and by proxy Haussmann Financial) admits this information cannot qualify as a trade secret. Their permitted disclosure of this information invalidates any argument advisers adequately maintain the information's secrecy as required by 18 U.S.C. 1839(3)(A).

## FIRST CLAIM FOR RELIEF

### (For Declaratory Judgment as to 18 U.S.C. § 1836)

### (All Plaintiffs against Defendant)

35. Plaintiffs restate and incorporate by reference each and every allegation contained in the above paragraphs as though fully set forth below.

36. An actual controversy exists between Plaintiffs and Defendant. Based on the Agreements' terms, Plaintiffs have good reason to believe Haussmann Financial will pursue litigation and injunctive relief against them under the DTSA, 18 U.S.C. § 1836, et seq., if they pursue alternative employment and contact or solicit their clients to join their new firm.

37. Plaintiffs contend their knowledge and/or possession of client contact information, and their use of that information to contact and solicit clients and

announce their affiliation with their new firm: (1) does not misappropriate Defendant's trade secrets or violate the DTSA, 18 U.S.C. § 1836; (2) does not breach any enforceable provision of Plaintiffs' agreements with Defendant; (3) is not unfair competition; and (4) does not otherwise entitle Defendant to obtain a TRO or preliminary or permanent injunctive relief against Plaintiffs.

38. Plaintiffs thus seek a declaration from the Court holding:

a. Plaintiffs have not misappropriated any of Defendant's protectable trade secrets or violated the DTSA;

b. Plaintiffs have not breached any enforceable provision of their agreements with Defendant and any provisions of any agreements Defendant may rely on in seeking to prevent Plaintiffs from using client contact information are invalid and unenforceable;

c. Defendant has no viable or enforceable claims against Plaintiffs arising out of their departure from Haussmann Financial or their affiliation with their new firm;

d. Defendant is barred from withholding any compensation owed to Plaintiffs; and

e. Defendant is not entitled to a TRO, preliminary injunction, permanent injunction, or other injunctive or monetary relief against Plaintiffs concerning their transition to a new firm, their announcement of their new affiliation to former clients, and their solicitation of clients to transfer their accounts to the new firm.

### SECOND CLAIM FOR RELIEF
**(For Declaratory Judgment as to the Agreements)**
**(All Plaintiffs against Defendant)**

39. Plaintiffs restate and incorporate by reference each and every allegation contained in the above paragraphs as though fully set forth below.

40. An actual controversy exists between Plaintiffs and Defendant. A court declaration is necessary to resolve the parties' respective rights and duties, as there is no adequate remedy at law.

41. Plaintiffs contend the Agreements they signed with Haussmann Financial are, in whole or in part, illegal, void, and unenforceable as against California public policy and Cal. Bus. & Prof. Code, § 16600, et seq. Enforcing the Agreements will constitute, among other things, unfair business practices, illegal restrictions on trade, and unfair competition.

42. Defendant drafted the Agreements (Exhibits 1 and 2) and required Plaintiffs to sign them as part of their Haussmann Financial employment.

43. The Dunphy Agreement bars Dunphy from soliciting any Haussmann Financial clients after his resignation: "From and after the termination of this Agreement, DUNPHY shall not, directly or indirectly, solicit for himself or any other person or entity any of HAUSSMANN's existing clients and HAUSSMANN shall not, directly or indirectly, solicit for itself, its shareholders, or any other person or entity any of DUNPHY's existing clients." *See* Ex. 1, Section VII(A).

44. The Dunphy Agreement also unlawfully restricts Dunphy from soliciting certain clients unless he pays Haussmann Financial a significant commission for each client:

> Notwithstanding anything in Paragraph VII.A., above, to the contrary, DUNPHY shall have the right to solicit PACIFIC BELL PERSONNEL including, without limitation, any persons listed on the PROSPECT LIST, following the termination of this Agreement and any such persons who thereafter become clients of DUNPHY shall be considered SUBSEQUENT CLIENTS with respect to whom ***DUNPHY shall be obligated to pay to HAUSSMANN the percentage of commissions applicable to SUBSEQUENT BUSINESS*** as set forth in Paragraph VI.C.2. *Id.*, Section VII(B). (Emphasis added).

45. Likewise, the Choi Agreement also restricts Choi from lawfully competing with Haussmann Financial if he resigns:

> CHOI specifically agrees that he (or any employer, subsidiary, or agent) will not hire, directly or indirectly, for a period of twelve (12) months after the termination of this agreement, any individual previously employed by Haussmann Financial, Inc. in the one year period prior to the termination of the agreement. CHOI agrees not to directly or indirectly solicit these individuals, or encourage them to leave the employment of Haussmann Financial, Inc., and agrees not to use their services in any fashion whatsoever for the time prescribed by this paragraph. Should CHOI violate this paragraph, the parties agree that liquidated damages shall be that CHOI shall pay whatever employer search fee Haussmann Financial, Inc. shall pay to locate a replacement individual, and CHOI shall pay an extra 10% to Haussmann Financial, Inc. on all JOINT BUSINESS and SUBSEQUENT BUSINESS for two (2) years after the employee becomes associated with Choi, his employer, subsidiary, agents, or assigns. *See* Ex. 2, Section IV(D).

46. The Choi Agreement also unlawfully requires Choi to continue paying commissions to Haussmann Financial even after his employment ends:

- For JOINT BUSINESS. CHOI shall pay Haussmann fifty percent (50%) of all COMMISSIONS he earns from that client. Any JOINT BUSINESS that originated outside of the SERVICE AREA shall revert to PERSONAL BUSINESS seven years after the date on which the retirement funds were invested. As set forth earlier, the designation of whether a client is within the SERVICE AREA shall be made at the time the client invests funds under the management of HAUSSMANN and shall be binding on the parties. The obligation to pay HAUSSMANN for JOINT BUSINESS shall terminate 5 years after termination of this AGREEMENT. *See* Ex. 2, Section III(A)(2).

- With respect to SUBSEQUENT BUSINESS, the parties shall print out a list of individuals who are prospective clients in the ACT databases maintained by HAUSSMANN and CHOI. Any contact in those databases that is serviced by CHOI after termination of this Agreement shall be considered SUBSEQUENT BUSINESS, and CHOI shall pay or cause to be

paid SUBSEQUENT COMMISSIONS to HAUSSMANN for a period of seven (7) years after that client's account begin to generate commission payments to CHOI. *See* Ex. 2, Section III(C)(2).

47. Plaintiffs thus seek a declaration from the Court holding:

   a. The Agreements signed by Plaintiffs are illegal, unconscionable, void, and unenforceable in their entirety; or

   b. Alternatively, those sections within the Agreements prohibiting Plaintiffs from soliciting clients or employees, or pay a penalty for soliciting clients or employees (*i.e.*, Exhibit 1, § VII, and Exhibit 2, §§ III and IV), are void and unenforceable.

## THIRD CLAIM FOR RELIEF

**(For Violating Cal. Bus. & Prof. Code, § 17200)**

**(All Plaintiffs against Defendant)**

48. Plaintiffs restate and incorporate by reference each and every allegation contained in the above paragraphs as though fully set forth below.

49. As detailed above, the Agreements contain illegal and unenforceable restrictive provisions violating Cal. Bus. & Prof. Code, § 16600, et seq.

50. Cal. Bus. & Prof. Code, § 16600.1(a) states, "It shall be unlawful to include a noncompete clause in an employment contract, or to require an employee to enter a noncompete agreement, that does not satisfy an exception in this chapter." "A violation of this section constitutes an act of unfair competition within the meaning of Chapter 5 (commencing with Section 17200)." Cal. Bus. & Prof. Code, § 16600.1(c).

51. As a direct and proximate result of Defendant's unlawful noncompete and non-solicitation restrictions, Plaintiffs have and will continue to suffer economic harm in the form of lost profits and business opportunities.

52. Plaintiffs thus seek injunctive relief, statutory penalties, and compensatory damages from Defendant in an amount to be determined at trial.

**PRAYER FOR RELIEF**

Based on the above, Plaintiffs request the following relief:

1. For a declaratory judgment, TRO, and preliminary injunction finding:

   a. Plaintiffs have not misappropriated any of Defendant's protectable trade secrets or violated the DTSA;

   b. Plaintiffs have not breached any enforceable provision of their agreements with Defendant and any provisions of any agreements Defendant may rely on in seeking to prevent Plaintiffs from announcing their affiliation with a new firm to their clients, or soliciting clients or employees, are invalid and unenforceable;

   c. Defendant has no claims against Plaintiffs related to their departure from Haussmann Financial;

   d. Defendant is not entitled to a TRO, preliminary injunction, permanent injunction, or other injunctive or monetary relief against Plaintiffs concerning their transition to a new firm and their client or employee solicitations;

   e. The Agreements are illegal, unconscionable, void, and unenforceable in their entirety or, alternatively, those sections within the Agreements prohibiting Plaintiffs from soliciting clients or employees (*i.e.*, Exhibit 1, § VII, and Exhibit 2, §§ III and IV) are void and unenforceable; and

   f. Any Haussmann Financial agreements that punish Plaintiffs for legally soliciting clients or employees to join their new firm are void and unenforceable;

2. For compensatory damages in an amount according to proof;

3. For prejudgment interest and post-judgment interest at the statutory rate;

4. For attorneys' fees and costs of suit based on the Agreements and Cal. Bus. & Prof. Code, § 16600, et seq.; and

5. For such other relief as the Court deems just and proper.

DATED: January 6, 2025         Submitted by,

**SHUSTAK REYNOLDS & PARTNERS, P.C.**
ERWIN J. SHUSTAK, ESQ.
MAHDI M. IBRAHIM, ESQ.

_____
ERWIN J. SHUSTAK, ESQ.
401 West "A" Street, Suite 2200
San Diego, CA 92101
Telephone: (619) 696-9500
Facsimile: (800) 868-9350

*Attorneys for Plaintiffs*
*John Dunphy and KiHo Choi*